# EXHIBIT C

DANIEL S. LIM (Cal. Bar No. 292406)
Email: limda@sec.gov
DOHOANG T. DUONG (Cal. Bar No. 219127)
Email: duongdo@sec.gov
MATTHEW T. MONTGOMERY (Cal. Bar No. 260149)
Email: montgomerym@sec.gov

Attorney for Plaintiff
Securities and Exchange Commission
Brent W. Wilner, Associate Director
Douglas M. Miller, Supervisory Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

## Southern Division

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. |
| Plaintiff, | **COMPLAINT** |
| vs. | |
| JOSEPH NEAL SANBERG, | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

Plaintiff Securities and Exchange Commission ("SEC" or the "Commission") alleges:

## JURISDICTION AND VENUE

1. The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1),

78u(d)(3)(A), 78u(e) & 78aa(a).

2. Defendant Joseph Sanberg ("Defendant" or "Sanberg") has, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged in this complaint.

3. Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district. In addition, venue is proper in this district because Defendant resides in this district.

## **SUMMARY**

4. Between in or about January 2021 and December 2022, Sanberg, the co-founder, board member, and shareholder of an environmental sustainability services company, Aspiration Partners, Inc. ("Aspiration"), engaged in a scheme to artificially inflate the company's revenue in order to attract investors and increase the value of its stock. To carry out the scheme, Sanberg made materially false and misleading statements to investors and engaged in other deceptive acts.

5. To make it appear as though Aspiration's business was rapidly growing, Sanberg recruited friends, associates, small businesses, and religious organizations and presented them to Aspiration as bona fide customers who were fully committed to paying large sums of money for Aspiration's services. These purported customers signed "letters of intent" or other one-to-two-page agreements ("LOIs") promising to pay $25,000 to $750,000 on a recurring basis in return for the company's reforestation services.

6. In reality, however, these LOIs were a sham because the purported customers (the "LOI Customers") had no intention of paying for the sustainability services they received from Aspiration. In fact, Sanberg made it clear to the LOI Customers that they did not actually have to pay for the services Aspiration provided.

7. Sanberg just needed the LOI Customers to sign the sham LOIs so that Aspiration could recognize the amounts in them as revenue, creating the false appearance that Aspiration was experiencing "explosive growth" and allowing Sanberg to tout Aspiration's performance to investors looking to buy its stock.

8. To add apparent legitimacy to these sham LOIs and ensure that Aspiration would continue recognizing the amounts on the LOIs as revenue, Sanberg paid the initial payment obligations of the LOI Customers by either sending funds to LOI Customers directly or sending funds to an entity that would then transfer those funds to Aspiration. Sanberg made these payments in a way to avoid detection by Aspiration.

9. Even as Sanberg stopped paying LOI Customer obligations, and Aspiration was left with a ballooning uncollected and aging receivable LOI balance, the company continued to recognize the amounts on the LOIs as revenue.

10. Sanberg took several steps in furtherance of this fraudulent scheme. Using his influence as a co-founder, large shareholder, and board member of the company, he limited the access that Aspiration employees had to the LOI Customers to avoid detection and continue his secret payments on their behalf. Sanberg also vouched for the LOI Customers and pushed for the amounts in the LOIs to be recognized as revenue, even though the LOI Customers had no intention of making payments and large portions of the purported revenue went uncollected. In addition, Sanberg made false and misleading statements about Aspiration's revenue to investors, saying things like the LOI Customers were "recurring, sticky and value-add" when, in fact, the LOI Customers had no intention of paying for the sustainability services they received from Aspiration. Sanberg also led certain investors to believe—falsely—that Aspiration's revenue projections for fiscal year 2022 were over $100 million higher than what the company had stated publicly.

11. The purported LOI Customer revenue artificially increased Aspiration's revenue by approximately $44 million for fiscal year 2021, even though

approximately $33,875,000 of that amount remained uncollected by December 31, 2021, and the rest had been paid by Sanberg.

12. In total, Sanberg's scheme resulted in his recruiting approximately 27 LOI Customers between 2021 and 2022, all of whom were ostensibly required to pay between $25,000 and $750,000 to Aspiration on a recurring basis.

13. Through his fraud, Sanberg raised more than $300 million from investors who falsely believed Aspiration had a thriving environmental sustainability services business.

14. By engaging in this conduct, Sanberg violated Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a)(3), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder.

15. Accordingly, the SEC seeks an order against Defendant: permanently enjoining him from future violations of these provisions and from participating in the issuance, purchase, offer, or sale of any security other than for his own personal accounts; requiring him to pay disgorgement of ill-gotten gains and prejudgment interest; requiring him to pay civil monetary penalties; and imposing an officer-and-director bar against him.

## THE DEFENDANT

16. **Joseph Neal Sanberg**, age 46, resides in Anaheim, California. He is a co-founder and, until March 2025, was a member of the board of directors of Aspiration. Sanberg also controls several other entities. Sanberg and his entities held 29.82% of Aspiration's shares as of September 2021.

## RELATED ENTITIES

17. **Aspiration Partners, Inc.** (n/k/a CTN Holdings, Inc.), a Delaware corporation based in Marina del Rey, California, was formed in 2013 to provide consumer banking services to consumers focused on environmental sustainability. In early 2024, Aspiration sold its financial services business and rebranded its carbon business as Catona Climate Solutions LLC ("Catona"). In or about March 2025,

4

CTN Holdings, the parent company of Catona, filed for bankruptcy. Neither Aspiration nor its securities have been registered with the Commission in any capacity.

18. **InterPrivate Financial Partners III** ("InterPrivate"), a Delaware corporation based in New York, New York, was formed as a blank check company, or Special Purpose Acquisition Company ("SPAC"), to pursue a business combination. InterPrivate's securities are registered under Section 12(b) of the Exchange Act and its common stock is quoted on the New York Stock Exchange (ticker symbol: IPVF). Starting in around August 2021, InterPrivate sought to acquire Aspiration through a merger agreement that was ultimately terminated.

## THE ALLEGATIONS

**A. The Fraudulent Scheme**

**1. Sanberg's Influence and Control Over Aspiration**

19. In 2013, Sanberg co-founded Aspiration, a privately held financial services company focused on environmental sustainability.

20. Sanberg was a large shareholder in and board member of Aspiration, and exercised decision-making authority over its business operations and fund-raising activities.

21. Sanberg was also personally and financially tied to the success of Aspiration.

22. From March 2020 through at least November 2021, Sanberg obtained more than $100 million in loans by pledging over ten million Aspiration shares as collateral.

23. Sanberg made clear to others that maintaining and increasing the value of Aspiration's shares was important to him personally, and would also benefit Aspiration.

24. For example, on November 29, 2020, Sanberg texted Aspiration's co-founder and Chief Executive Officer ("CEO"): "Figure out how to get me the money

5

tomorrow or I'll be in default. It's your turn to do what needs to be done. . . . But if you don't get me the money tomorrow we are all f…ed. Get me the money. Your turn to figure it out like I have for so long. Wire it to the [Sanberg-entity] account. If you don't then [the lender] will foreclose. This will give you a good taste of what I have to experience every day. I hate you and I hate this company and I don't want to work anymore with you [ ]. You are so oblivious to what you've forced me to have to do."

### 2. Sanberg Takes Advantage of a New Line of Business

25. In late 2020, Aspiration began offering environmental sustainability services directly to individual and corporate customers under a wholly owned subsidiary called Aspiration Sustainable Impact Services, LLC ("ASIS").

26. This new line of business offered carbon offsets and reforestation services, i.e., tree-planting, where customers would pay Aspiration, which in turn would pay a third party to plant trees.

27. Starting in or around December 2020, Sanberg began to recruit the LOI Customers, including those friends and associates he directly communicated with and those who heard about the opportunity from those friends and associates.

28. Sanberg made it clear to the LOI Customers he communicated with directly that they could receive reforestation and carbon footprint reduction services from Aspiration at no charge, through subsidies or "sponsorships."

29. Specifically, Sanberg told them that he or his entities would pay Aspiration, or provide the LOI Customers funds to pay Aspiration, for these services.

30. As a result of Sanberg's representations, the LOI Customers believed that they did not have to pay for Aspiration's reforestation services, and had no intention of paying for them.

### 3. Sanberg Has His Customers Sign Bogus "Letters of Intent"

31. Despite his verbal assurances to the LOI Customers that they need not pay for the services they received from Aspiration, starting in or around January

2021, Sanberg prepared, or caused others to prepare, LOIs that made it appear like those customers were financially obligated to purchase a certain number of "trees per month" in return for a monthly/quarterly fee to Aspiration.

32.     These LOIs were illusory because they did not indicate that customers were not actually obligated or expected to pay the monthly/quarterly fees.

33.     The LOI Customers signed the LOIs, and Aspiration's CEO counter-signed them on behalf of Aspiration.

34.     In 2021, Aspiration entered into approximately 27 LOIs and each of the LOI Customers purportedly agreed to pay amounts ranging from $25,000 to $750,000 to Aspiration on a monthly/quarterly basis.

35.     The chart below contains the initials of the LOI Customers, the effective dates of the LOIs, and the purported monthly or quarterly payment obligations:

| INITIALS | DATES | AMOUNT |
|---|---|---|
| A.P.M. | 1/1/2021 | $500,000 |
| D. | 1/1/2021 | $250,000 |
| G.P.M.S. | 1/1/2021 | $50,000 |
| G.B. (assigned to S.B.) | 1/1/2021 | $350,000 |
| 3.E. | 2/1/2021 | $250,000 |
| C.M. | 2/1/2021 | $50,000 |
| C.E. | 2/1/2021 | $100,000 |
| E.L.F. | 2/1/2021 | $50,000 |
| F.A.V.R. | 2/1/2021 | $50,000 |
| F.A. | 2/1/2021 | $50,000 |
| J.M. | 2/1/2021 | $50,000 |
| Y.I.N.B.H. | 2/1/2021 | $25,000 |
| E.P. | 3/1/2021 (amended from 2/1/2021 LOI) | $425,000 |
| M.E. | 3/1/2021 (amended from 2/1/2021 LOI) | $100,000 |
| 5.N.A.V. | 3/1/2021 | $50,000 |
| D.D.C. | 3/1/2021 | $150,000 |
| G.R. | 3/1/2021 | $50,000 |
| N.C. | 3/1/2021 | $25,000 |
| O.C. | 3/1/2021 | $50,000 |

| O. | 3/1/2021 | $50,000 |
|---|---|---|
| S.S.E. | 3/1/2021 | $75,000 |
| V. | 3/1/2021 | $50,000 |
| W. | 3/1/2021 | $50,000 |
| W.P. | 3/1/2021 | $50,000 |
| A.C.D. | 6/1/2021 | $750,000 |
| H.L.I. | 6/1/2021 | $300,000 |
| S.I. | 6/1/2021 | $50,000 |

### 4. Sanberg Limits Access to the LOI Customers

36. Sanberg tightly controlled Aspiration's communications with the LOI Customers, preventing Aspiration from conducting onboarding procedures designed to, *inter alia*, ensure that Aspiration's customers could meet their financial obligations.

37. Sanberg even had to approve the process by which invoices were sent to LOI Customers.

38. For example, on February 17, 2021, when Aspiration's CEO emailed Sanberg asking for an LOI Customer's address to send an invoice, Sanberg replied: "You should send it to me. And for all my relationships with [the LOI Customers] please email me the invoices to pass on."

39. Similarly, on March 26, 2021, when Aspiration's CEO asked Sanberg for his permission to send February and March 2021 invoices to an LOI Customer, Sanberg permitted the executive to send only one of the two invoices.

### 5. Sanberg Secretly Makes Payments for the LOI Customers

40. Despite the purportedly binding payment obligations imposed on LOI Customers, Sanberg made any and all payments on their behalf.

41. Sanberg did this by sending funds from bank accounts he controlled to either the LOI Customer or Aspiration.

42. As one example, Sanberg paid the LOI Customer obligations by sending funds to the LOI Customer, as follows:

8

a. On June 4, 2021, Aspiration emailed the March invoice to E.P. for $425,000;

b. On June 14, 2021, Aspiration emailed the April invoice to E.P. for $425,000;

c. On June 14, 2021, Sanberg wired $450,000 from a bank account he controlled to E.P.;

d. On June 15, 2021, E.P. wired $425,000 to Aspiration;

e. On June 15, 2021, Sanberg wired $450,000 from a bank account he controlled to E.P.; and

f. On June 15, 2021, E.P. wired $425,000 to Aspiration.

43. As another example, Sanberg paid the LOI Customer obligations by sending funds first to a separate entity, which would then send those funds to Aspiration, as follows:

a. On March 19, 2022, Aspiration emailed a September 2021 invoice to S.B.;

b. On March 22, 2022, Sanberg wired $350,000 from a bank account he controlled to a separate entity affiliated with Sanberg;

c. On March 22, 2022, that entity transferred the $350,000 to Aspiration, with a description indicating that the funds were for S.B.'s invoice.

44. In these ways, Sanberg provided and sent the funds for every payment that was made by an LOI Customer to Aspiration from 2021 to 2022. These payments totaled approximately $33,575,000.

**6. Aspiration's Artificially Inflated Revenues Are Recognized and Disseminated to the Public**

45. In or around March 2021, Aspiration sought to become a public company through a SPAC merger. In pursuit of this goal, Aspiration hired KPMG to conduct an audit of Aspiration's finances.

46. KPMG considered Aspiration's expected revenue stream from LOI Customers an important factor in its audit.

47. With Sanberg's support, Aspiration recognized the revenue purportedly generated by the LOI Customers as actual revenue, despite the fact that Sanberg had agreed to cover their payments and despite concerns among Aspiration's finance department regarding the collectability of such payments.

48. The revenue recognized from LOI Customers represented a significant portion of Aspiration's overall revenue for fiscal year 2021.

49. Specifically, for fiscal year 2021, LOI Customer revenue accounted for approximately $44 million of Aspiration's $100.6 million in recognized revenue. Aspiration recognized this approximate $44 million in LOI Customer revenue, even though approximately $33,875,000 million remained uncollected as of December 31, 2021.

50. On August 18, 2021, Aspiration announced the proposed SPAC merger with InterPrivate in a joint press release that was attached to a publicly filed Form 8-K.

51. In an August 2021 investor presentation, which was attached to Aspiration's Form 8-K filed on August 18, 2021, Aspiration titled a slide "Explosive growth from a standing start" and noted its "Corporate ESG [or Environmental, Social, and Governance] Business has Scaled Rapidly . . ."

52. The slide showed significant growth in Aspiration's annual recurring revenue in the first two quarters of 2021, referring to the number of "corporate clients" (i.e., primarily the LOI Customers) and revenue from the same.

53. In a Form S-4 filed on February 15, 2022, InterPrivate included Aspiration's results of operations for the nine months ended September 30, 2021, which compared to the nine months ended September 30, 2020, showing that "[e]nterprise sustainability services revenue" went from $0 in 2020 to $33.7 million in 2021.

10

54. The same Form S-4 showed that Aspiration's total revenue went from $9.2 million for the nine months ended September 30, 2020 to $62 million for the nine months ended September 30, 2021.

55. In a press release a few days later, Aspiration's CEO stated: "Our results for the fourth quarter and full year 2021 demonstrate Aspiration's key role at the forefront of driving the sustainability revolution" and "Aspiration's strong, ongoing growth in revenues and gross profits reinforces the power of our differentiated business model . . . ."

56. In the same press release, Aspiration announced that its total revenue in 2021 was $100.6 million, "up 584%" from 2020 due in part to "Enterprise Sustainability Services."

### 7. Sanberg Solicits Investors by Touting the Artificially Inflated Revenues

57. Between September and December 2021, Investor 1 purchased over $50 million in Aspiration stock.

58. Before Investor 1 made this investment, Sanberg touted Aspiration's successes and profitability in the corporate ESG sector to Investor 1's Chief Investment Officer ("CIO") in person and over the phone, making materially false and misleading statements to Investor 1 in the process.

59. As an example, Sanberg touted how Aspiration's ESG business "represented a large area of profitability" for the company.

60. Further, on February 17, 2022, shortly after the investment and as a lulling tactic, Sanberg emailed Investor 1's CIO with a subject line "analysis of Aspiration 4Q results," noting that "Aspiration produced $100mm of revenue" in 2021, and touting how Aspiration was "growing as fast/faster" and "a lot more efficiently and profitably than projected."

61. Investor 1's CIO considered these representations about Aspiration's successes in the corporate ESG sector and rapid growth to be "extremely important"

11

in Investor 1's decision to purchase Aspiration stock, as it made the company look "incredibly well" financially.

62. On December 15, 2021, Investor 2 purchased $250 million in Aspiration stock through a special purpose entity.

63. Prior to this investment, on September 2, 2021, Aspiration shared detailed financials with Investor 2, including the purported revenue from LOI Customers for the first half of 2021.

64. On September 8, 2021, after reviewing the financials, Investor 2's managing director asked, among other things, about the average term of the agreements that LOI Customers were signed up to and whether they were "one-off consulting agreements."

65. On the same day, Sanberg emailed a reply to Investor 2's question, saying that the agreements with LOI Customers were "definitely not one-off consulting agreements" and "we are engaging our corporate clients in long term relationship[s]."

66. In that same email, Sanberg said he "wanted to call out this point because I think it's such a big deal" and noted that Aspiration's relationship with the LOI Customers was "recurring, sticky and value-add" in nature.

67. In an October 12, 2021 email, Sanberg told Investor 2 about a specific LOI Customer, E.P., saying that it was "carbon neutral through Aspiration" and that he expected "more opportunities for deals like this."

68. Investor 2 considered these representations regarding the purported success, long-term relationship, and revenue generated from the LOI Customers to be important in its decision to invest.

### 8. Sanberg Further Inflates the Already Inflated Revenues

69. At the start of 2022, Aspiration hoped to take advantage of its purportedly strong 2021 financial performance, based in large part on "revenue" generated by the LOI Customers, and use it to attract even more investors.

12

70.     InterPrivate included in its February 15, 2022 Form S-4 that Aspiration expected an estimated $254 million in total revenue for fiscal year 2022.  The Form S-4 also contained a "Letter from the Co-Founders" of Aspiration—identified as the CEO and Sanberg—to "Prospective Shareholders," stating that the enterprise sustainability services revenue for the nine months ended September 30, 2021 "represents a significant avenue for future growth."

71.     Despite these estimates in the Form S-4, Sanberg wanted to separately present much higher projections (i.e., $385-to-$386 million) to select, potential investors who had signed confidentiality agreements.

72.     Aspiration's Chief Financial Officer ("CFO") disagreed with Sanberg on this approach, due to issues with recognizing and collecting LOI Customer revenue, and expressed a preference for sharing the publicly disclosed, lower projection.

73.     Specifically, on March 14, 2022, the CFO informed Sanberg: "We do have some revenue recognition risk that I wanted to outline for you. . . .  As such, we may not be able to recognize all the revenues outlined [in Sanberg's higher projections]."

74.     In that same email, the CFO told Sanberg: "There is also risk with the existing Enterprise business.[]  Our collection has been poor and KPMG may push us to reverse or write off some revenue.  But our main challenge today is revenue recognition. . . .  Considering the revenue recognition risk, my recommendation is to go out with one set of projections ($255M)."

75.     On March 31, 2022, the Aspiration board, which included Sanberg, received the company's 2022 budget, which forecasted the lower $255 million in revenue for fiscal year 2022, largely driven by a forecast of $150 million in "[e]nterprise sustainability revenue."

76.     However, Sanberg still insisted on showing select investors the higher projections.

13

77.     After the March 31, 2022 email to Aspiration's board with the lower forecast, Sanberg went forward with circulating the higher projections to prospective investors who had signed confidentiality agreements.

78.     On April 6, 2022, Sanberg emailed a prospective investor this confidential "Investor Addendum," which projected that Aspiration would achieve "$386 million in total revenues in 2022" and discussed "strong demand generated by our Enterprise business."

79.     In the same April 6, 2022 email, Sanberg told the potential investor that the Investor Addendum contained "internal projections" that were "substantially ahead of the public projections that Aspiration disclosed to the marketplace."

80.     Sanberg was also copied on an April 25, 2022 email from an Aspiration executive to another prospective investor containing the higher 2022 revenue projections—i.e., more than $385 million in revenue for fiscal year 2022 based on expected revenue of over $280 million in "Enterprise Sustainability Services"—and purported actual revenue from LOI Customers in 2021.  In this email, the executive similarly told this prospective investor that the higher projections were "based on our internal targets rather than the more conservative numbers we've shared publicly."

81.     The prospective investors who received these inflated projections considered them important in deciding whether to invest in Aspiration.

### 9.     Sanberg Obtained Money and Shares from Aspiration as a Result of the Artificially Inflated Revenue

82.     Sanberg received significant compensation from Aspiration between 2021 and 2022 for his work recruiting LOI Customers.

83.     For example, on April 12, 2021, an Aspiration board resolution granted Sanberg an option to purchase 3,338,809 shares of Aspiration stock.

84.     Aspiration's CEO later memorialized this grant by signing an Aspiration services contract dated September 13, 2021, which stated that "in exchange for Joseph Sanberg's advisory services related to Aspiration Sustainable Impact Services

14

LLC . . . the Company has offered 3,338,809 common stock options of the Company to Joseph Sanberg [] in consideration for these services."

85. In September 2021, Aspiration internally valued 3,338,809 in its common stock at tens of millions of dollars.

86. Aspiration's CEO signed another services contract dated July 29, 2021, which obligated Aspiration to pay one of Sanberg's entities $475,000 "in exchange for Joseph Sanberg's services related to Aspiration's Sustainable Impact Services LLC."

87. Aspiration's CEO signed another services contract dated August 30, 2021, which obligated Aspiration to pay one of Sanberg's entities $550,000 and specified that the payment was "related to Aspiration Sustainable Impact Services LLC."

88. Aspiration's CEO signed another Aspiration services contract dated September 30, 2021, which obligated Aspiration to pay one of Sanberg's entities $525,316 "in exchange for Joseph Sanberg's services related to [Aspiration's] sustainability impact business." An identical contract dated October 22, 2021, for $512,476, was also signed by the CEO.

89. In all, in 2021, Aspiration paid Sanberg and his entities over $3.6 million in cash.

90. In addition, during its January 2022 meeting, the Aspiration board granted Sanberg a one-time cash bonus of $8,000,000, deeming such a grant "advisable and in the in best interests of the Company."

91. In the same January 2022 meeting, the Aspiration board approved the grant of "9,000,000 shares of fully vested Restricted Stock to Joseph Sanberg . . . to reward Mr. Sanberg for his service to the Company and in order to incent Mr. Sanberg to continue his service to the Company."

92. In all, in 2022, Aspiration paid Sanberg and his entities approximately $8 million in cash.

93. As of December 31, 2022, Sanberg and his entities owned more than 33 million shares of Aspiration stock, representing 24.8% of all outstanding shares of the company.

94. Aspiration made these lucrative payouts to Sanberg despite having low cash reserves and employees expressing concerns over Aspiration's ballooning accounts receivable and accounts payable balances.

95. Moreover, Sanberg used a portion of millions of dollars he obtained from Aspiration to pay the monthly/quarterly fees owed by the LOI Customers.

96. For example, Sanberg used nearly $2.3 million of his aforementioned $8 million cash bonus from January 2022 to pay invoices for approximately five LOI Customers in early February 2022.

**10. Sanberg's Inflated Revenue Scheme Falls Apart**

97. In 2022, revenue from the LOI Customers accounted for over $40 million of Aspiration's $216,764,449 in recognized revenue.

98. However, Aspiration's accounts receivable balance had increased to approximately $104 million by June 2022, higher than the entirety of the company's 2021 revenue.

99. On March 18, 2022, an Aspiration accountant lodged an internal complaint to express concerns about "related party transactions" pertaining to Aspiration's reforestation services business, lack of supporting documentation for LOI Customer revenue, Aspiration's uncollected balances, and invoicing issues.

100. As a result, the Aspiration board agreed to form a Special Committee to investigate these concerns. By April 5, 2022, all board members, including Sanberg, signed the "Action by Written Consent of the Board" establishing the Special Committee.

101. On or about July 5, 2022, after the creation of the Special Committee, KPMG resigned as Aspiration's outside auditor, citing, among other factors, "revenue transactions that had characteristics of fraud."

16

102. In late 2022, Aspiration's new management launched a revenue remediation project that resulted in Aspiration restating its financial statements for fiscal years 2021 and 2022.

103. In August 2023, InterPrivate announced that it was abandoning its SPAC merger with Aspiration.

**B.      Sanberg's False and Misleading Statements**

104. In furtherance of and in connection with the fraudulent scheme to artificially inflate Aspiration's revenue, Sanberg made various false and misleading representations to investors.

105. Sanberg was the maker of these false and misleading statements because he had ultimate authority over their content and/or approved their dissemination.

106. Sanberg's false and misleading statements were material in that they would have been viewed by a reasonable investor as important in making an investment decision and as having significantly altered the total mix of information made available to the investor.

107. First, Sanberg represented to investors that Aspiration's LOI Customer business—which was referred to as Aspiration's corporate ESG business, Enterprise Sustainability business, or ASIS business—was highly successful and profitable.

108. Second, he represented to investors that LOI Customers were long-term customers.

109. Third, he specifically identified a few specific LOI Customers for investors, to prove that they existed.

110. Fourth, he circulated to investors inflated 2022 projections that were premised on revenue from the LOI Customers.

111. All of these representations were materially false and misleading because Sanberg omitted the fact that he assured the LOI Customers they would not have to pay for Aspiration's services, that the LOI Customer revenue was predicated on Sanberg paying the monthly/quarterly fees on behalf of the LOI Customers, that

Sanberg was partially relying on money he obtained from Aspiration to cover those monthly/quarterly payments, and that a significant portion of the LOI Customer revenue remained uncollected.

112.   In addition, with respect to the 2022 projections, Sanberg omitted that Aspiration's CFO expressed concerns about the collectability of the projected revenue and its ability to be recognized as revenue.

C.   **Sanberg Acted with Scienter and Negligently**

113.   Sanberg acted with scienter in carrying out the scheme to defraud and in making the false and misleading statements to investors.  Sanberg also acted negligently in carrying out his scheme and in making the false and misleading statements, that is, Sanberg failed to exercise the level of care that a reasonable person would have exercised under the same circumstances.

114.   Sanberg's scienter and failure to act reasonably under the circumstances is demonstrated, in part, by the following:

(a)   Sanberg knew, or was reckless and negligent for not knowing, that the LOIs were artificially inflating Aspiration's revenue, both internally and to the public, because he assured LOI Customers they did not actually have to make the payments set forth in the LOIs.

(b)   Sanberg paid the invoices sent to the LOI Customers by either paying Aspiration or by wiring money to the LOI Customers for the customers to pay Aspiration.

(c)   Sanberg limited Aspiration's communication with the LOI Customers, controlling who could send invoices to them, and how many invoices could be sent at one time.

(d)   Sanberg ensured that little to no due diligence was done on the LOIs themselves, including on the identity and paying ability of the LOI Customers.

(e)   Despite knowing that he told LOI Customers they would not have to pay for Aspiration's services, and that most of the LOI Customer

18

monthly/quarterly payments were not actually being made, Sanberg touted the LOI Customers to Aspiration investors, calling them "a big deal" and claiming they were "recurring, sticky and value-add."

(f) Despite knowing that his inflated 2022 projections were based on LOI Customer revenue that he financed and was largely uncollected, Sanberg created, advocated for, and disseminated to investors those inflated projections.

(g) Sanberg knew, or was reckless and negligent for not knowing, that the inflated 2022 projections were riddled with revenue recognition issues, as specifically outlined for him by Aspiration's CFO, before he sent them out to investors.

## FIRST CLAIM FOR RELIEF

**Fraud in Connection with the Purchase or Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

115. The SEC realleges and incorporates by reference paragraphs 1 through 114 above.

116. In connection with the purchase or sale of securities, Sanberg engaged in a scheme to defraud and made material misstatements, false statements, and omissions to investors. Specifically, Sanberg (1) recruited LOI Customers to buy Aspiration's tree-planting services and maintained exclusive relationships with them; (2) had LOI Customers sign LOIs that purportedly obligated them to pay Aspiration over a long period of time but assured them that they would not actually have to do so; (3) made those payments himself through accounts he controlled and, in some cases, with money Aspiration paid him; (4) ensured that Aspiration recognized such payments and uncollected LOI Customer payments as revenue even though LOI Customers did not pay the amounts due and the LOIs themselves were not properly vetted; (5) made false statements to investors that such "revenue" was a sign of Aspiration's long-term success; and (6) lulled investors with financials showing such purported revenue.

117. By engaging in the conduct described above, Sanberg, with scienter, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

118. By engaging in the conduct described above, Sanberg violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

**SECOND CLAIM FOR RELIEF**

**Fraud in the Offer or Sale of Securities**

**Violations of Sections 17(a) of the Securities Act**

119. The SEC realleges and incorporates by reference paragraphs 1 through 114 above.

120. In the offer or sale of securities, Sanberg engaged in a scheme to defraud and made material misstatements, false statements, and omissions to investors. Specifically, Sanberg (1) recruited LOI Customers to buy Aspiration's tree-planting services and maintained exclusive relationships with them; (2) had LOI Customers sign LOIs that purportedly obligated them to pay Aspiration over a long period of time but assured them that they would not actually have to do so; (3) made those payments himself through accounts he controlled and, in some cases, with money Aspiration paid him; (4) ensured that Aspiration recognized such payments and uncollected LOI Customer payments as revenue even though LOI Customers did not pay the amounts due and the LOIs themselves were not properly vetted; (5) made false statements to investors that such "revenue" was a sign of Aspiration's long-term

success; (6) lulled investors with financials showing the purported revenue; and (7) disseminated false, unsupported, and inflated projections to prospective investors.

121. By engaging in the conduct described above, Sanberg, with scienter, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

122. By engaging in the conduct described above, Sanberg violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Defendant committed the alleged violations.

### II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendant and his agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

21

**III.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendant from directly or indirectly, including, but not limited to, through any entity he owns or controls, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent him from purchasing or selling securities for his own personal accounts.

**IV.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] and/or Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)], prohibiting Defendant from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

**V.**

Order Defendant to disgorge all funds received from his illegal conduct, together with prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(3); 78u(d)(5) and 78u(d)(7)].

**VI.**

Order Defendant to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] for their violations of the federal securities laws.

**VII.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VIII.

Grant such other and further relief as this Court may determine to be just and necessary.


Dated:  August 21, 2025

/s/ Daniel S. Lim
Daniel S. Lim
Attorney for Plaintiff
Securities and Exchange Commission

## **Jury Demand**

The SEC demands trial by jury on liability.


Dated:  August 21, 2025

/s/ Daniel S. Lim
Daniel S. Lim
Attorney for Plaintiff
Securities and Exchange Commission

23